UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS - SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CANDICE COLE<br>    *Plaintiff,* | §<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. SA-09-CA-0597-H |
| SANDEL MEDICAL<br>INDUSTRIES, L.L.C.<br>    *Defendant.* | §<br>§<br>§ | |

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Sandel Medical Industries, LLC, ("Sandel" or "Defendant"), makes and files this Motion for Summary Judgment under FRCP 56. The description in the "factual background" section is provided for informational purposes only.

### I.   FACTUAL BACKGROUND

Sandel is a medical supply company focusing in the area of patient and hospital employee safety. To identify safety issues which need to be addressed, Sandel collaborates with healthcare professionals by accepting online idea submissions as part of its research and design process. To this end, Sandel's website includes a page where hospital personnel are encouraged to submit ideas.[1] The bottom of the website submission form provides that Sandel and the submitter "shall have no further obligations to each other, unless a separate agreement is entered in to."[2]

Sandel has received thousands of submissions and holds quarterly review meetings where it reviews the submissions received to determine whether or not the submissions are within the scope of Sandel's product line, whether Sandel has already received a submission for a similar product and whether the product idea is feasible. Based on these meetings, Sandel sends out letters to all submitters. When Sandel decides to proceed with an idea it informs the idea

---

[1] Declaration of Steve Leatherman, March 19, 2010, ¶¶5-6 and **Exhibit A**, Sandel Website Idea Submission Page at the time of Plaintiff's submission.
[2] *Id.*

1

submitter that their idea has been selected. At that point, Sandel negotiates an agreement with the submitter. Typically, the idea is not protectable so Sandel offers the submitter its standard idea submission agreement. The agreement for non-proprietary ideas provides for a payment of $250 upon execution, $500 when the first order for the product is placed and royalty up to $4,000 per year for five years which is usually calculated as 2% of net sales. Sandel has a product line of 28 products which it actively markets. Of these 28 products, 12 originated as submissions to Sandel from health care providers who were paid for their submissions.[3]

In 2004, Sandel introduced a line called "TIME OUT® Products"[4] inspired by a 2004 Joint Commission rule which requires all hospitals to perform a "time-out" immediately prior to surgery.[5] The purpose of the time-out is to verify that the correct procedure is being performed on the correct patient in the correct place.[6] Almost all hospitals comply with the Joint Commission rules because it is a requirement for Medicare reimbursement[7] In fact, according to the Joint Commission website, "more than 17,000 health care organizations and programs in the United States" are accredited and certified by the Joint Commission.[8]

Beginning in 2004, Sandel began promoting its TIME OUT® Products to hospitals. All TIME OUT® Products are orange in color and have the words "TIME OUT" written on them in bold letters.[9] Plaintiff was aware of Sandel's TIME OUT product line them when she submitted her idea for an orange 8 1/2 X 11 piece of paper with adhesive on one side containing the words TIME OUT.[10] On April 19, 2005 Sandel obtained US Trademark Registration 2,966,022 for TIME OUT in the area of "[r]eusable and disposable tools, appliances and accessories used in an

---

[3] *Id.* at ¶ 7-10, 14-16.
[4] *Id.* at ¶ 23.
[5] Leatherman Dec. at ¶ 24.
[6] *See* Cole Dep. 51:10-18, Jan 22, 2010. **Exhibit B:** Speak UP Poster, Joint Commission.
[7] *See* 42 U.S.C. §§ 1395bb(a), (b).
[8] http://www.jointcommission.org/AboutUs/ last accessed March 16, 2010.
[9] Leatherman Dec. at ¶ 25.
[10] *Id.* at ¶¶ 28, 30 and **Exhibit C**, Plaintiff's Submission.

2

operating room during surgical procedures, namely, skin markers for surgical use and paper-based sleeves for use with surgical scalpels," with a date of first use on February 26, 2004.[11]

Plaintiff is a nurse at the Methodist Healthcare System of San Antonio ("Methodist Hospital").[12] Methodist Hospital operates many health care facilities in San Antonio, Texas. On February 17, 2006, Plaintiff submitted the following idea through Defendant's website:

> I propose an 8 1/2 x 11 ORANGE SHEET of paper that has in LARGE BOLD PRINT "TIME OUT".  This sheet would have an adhesive on the back and it could be adhered to whatever draping the Surgeon will be using.  After the Surgeon is gowned and gloved the Tech always hands the drape to the surgeon, this ORANGE sheet will be adhered to the drape and draw attention the matter of performing the TIME OUT not only to the Tech but to the SURGEON as well. The TIME OUT can then be performed prior to draping and the beginning of the procedure as per JACHO standard and ensure 100% compliance.[13]

Prior to making her submission, Cole was aware of Sandel's TIME OUT product line including Sandel's orange "Time Out" marking pen, which she mentioned in her submission.[14] As such, Plaintiff's suggestion to use the color orange and the words "TIME OUT" was not new, it was based on Defendant's other orange TIME OUT products. The only element of Plaintiff's submission that was not already in use in Sandel's other products were the use of an 8 ½ X 11 sheet of paper with an adhesive backing which could be adhered to the draping used by a surgeon.[15] None of these suggestions were incorporated in Defendant's TIME OUT beacon. A piece of paper with the word "TIME OUT" printed on it is not protectable.[16]

Plaintiff submitted her idea through Defendant's website submission form.[17] The form has no mention of financial compensation. At the time of Cole's submission, the form stated:

---

[11] Leatherman Dec. ¶ 29 and **Exhibit D**, Sandel TIME OUT Trademark Registration.
[12] Cole Dep. 10:5-6. *See* http://www.mhshealth.com, last accessed March 16, 2010. Methodist Hospital is accredited by the Joint Commission and has implemented the Time Out Protocol since 2004.
[13] Cole Dep. 15:15-19.  Leatherman Dec. ¶ 30 and **Exhibit C**, Plaintiff's Submission.
[14] Cole Dep. 23:24-24:9. Leatherman Dec. ¶ 31 and **Exhibit C**, Plaintiff's Submission.
[15] Leatherman Dec. at ¶ 32.
[16] See *In Re Gulak*, 703 F.2d 1381, 1385 (Fed. Cir. 1983); accord *In re Ngai*, 367 F.3d 1336 (Fed. Cir. 2004).
[17] Cole Dep. 12:20-24.

> I do not give any rights in my submission to Sandel Medical Industries L.L.C. (SMI). Any rights in my submission may be given to SMI only in a future agreement between SMI and myself.
>
> I agree not to reveal my submission (verbally or in writing) to anyone other than SMI, for one year from the date of this agreement.
>
> SMI agrees not to use, sell, or disclose to others, any of the submitter's information provided above. SMI accepts this submission only for evaluation. SMI and submitter shall have no further obligations to each other, unless a separate agreement is entered in to.[18]

Before submitting her idea, Plaintiff had to click "I agree" to the language above.[19]

After Plaintiff's submission was reviewed, on April 14, 2006 Sandel wrote to Plaintiff and informed her that it had decided not to pursue Plaintiff's submission. The letter informed Plaintiff she was "released of any obligations with [Defendant] and [Plaintiff] may pursue [her] issue at liberty with another organization." Plaintiff's submission was not practical because it is difficult to sterilize paper. Moreover, a paper adhered to the drape in a sterile environment, would not be removable without risking sterility. Thus, Plaintiff's idea was not feasible on many levels.[20] Plaintiff's submission, the computer generated acknowledgement of receipt and the letter from Reday were the only communications between Plaintiff and Defendant in 2006.[21]

In July of 2007, Defendant began development of its Time Out Beacon following a suggestion by a nurse at Tarzana Hospital in Tarzara, CA, Lynn Miles, of a making a standard operating room towel orange with the words TIME OUT on it. Miles is currently being compensated for her idea pursuant to Sandel's standard idea submission agreement. The Time Out Beacon is similar to a standard surgical towel, only dyed orange and with the words "TIME OUT" prominently placed thereon. Sandel's Time Out Beacon does not have any adhesive

---

[18] Leatherman Dec. at ¶¶ 39-40 and **Exhibit A**, Sandel Website Submission Form from Time of Submission.
[19] Cole Dep. 14:13-18.
[20] Leatherman Dec. at ¶ 33-35, 41 and **Exhibit E**, Letter from Reday to Cole, April 14, 2006.
[21] Cole Dep. 92:10-19.

backing. Indeed, the only thing that Plaintiff's submission and Defendant's TIME OUT Beacon have in common is that they are orange and have the words TIME OUT written on them. Due to the significant differences between Plaintiff's submission and Defendant's commercially marketed Time Out Beacon orange towel, no connection was drawn between the two.[22]

However, when Defendant launched its Time Out Beacon, it received a complaint from Plaintiff indicating that she believed she was the first submitter of the idea for the Time Out Beacon and demanding compensation. Defendant reviewed Plaintiff's submission and Defendant's Time Out Beacon and concluded that they are not the same idea. Regardless, to assuage Plaintiff's demands, the decision was made to offer Plaintiff its standard idea agreement.[23] Defendant decided to offer Plaintiff this agreement in an effort to maintain good will with idea submitters in general. This had led Plaintiff to demand payment of a 400% royalty until the recently submitted 4th and 5th amended complaints which have not been entered.

## II. STANDARDS FOR SUMMARY JUDGMENT

The purpose of a motion for summary judgment is to determine whether there exist genuine issues of material fact to be tried.[24] Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[25] A factual issue is material if its resolution could affect the outcome of the action and disputes about such factual issues are genuine if the evidence would allow a reasonable jury to find for the non-moving party.[26]

## III. ARGUMENTS AND AUTHORITIES

---

[22] Leatherman Dec. ¶ 31-32, 42, 44, 46, 47.
[23] *Id.* at 48-49.
[24] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[25] FED. R. CIV. P. 56(c).
[26] *GeoSouthern Energy Corp. v. Chesapeake Operating, Inc.,* 274 F.3d 1017, 1020 (5th Cir. 2001).

This case is in Federal Court based on diversity of citizenship. The underlying claims are based on Texas State law.

*a. Breach of Contract*

The facts and issues in this case are strikingly similar to those in *Kleck v. Bausch & Lomb, Inc.*[27] which held that where an idea is completely disclosed without a corresponding promise at the time of submission to pay for that idea, no binding agreement is created due to failure of consideration.[28] In *Kleck*, the plaintiff submitted an idea to Bausch & Lomb (B&L) for a vampire themed marketing strategy related to sunglasses.[29] Before submitting his idea, Kleck had B&L sign an agreement promising "not to use or disclose Kleck's marketing ideas 'until or unless a later written agreement between [Kleck] and [B&L] in [sic] entered into.'"[30] The court noted that this was "at best an 'agreement to agree,' which Texas law will not enforce."[31]

The *Kleck* decision was based on the holding in *Fort Worth Indep. School District. v. Fort Worth*.[32] In *Fort Worth*, the alleged contract provided: "If the City should negotiate a new agreement with [Bell], we commit the City to arriving at an appropriate arrangement with the FWISD to share in that revue."[33] In reviewing this agreement, the court found that this was simply an "agreement to make a future contract" and held that the agreement was unenforceable because it was merely an "agreement to agree" and was not specific as to all terms.[34]

Here, Plaintiff submitted her idea through Sandel's website which provided the parties would "have no further obligations to each other, unless a separate agreement is entered in to."[35]

---

[27] 145 F. Supp. 2d 819, 824-26 (W.D. Tex. 2000).
[28] *Id.*
[29] *Id.* at 823.
[30] *Id.* at 826.
[31] *Id.*
[32] 22 S.W.3D 831 (Tex. 2000).
[33] *Id.* at 846.
[34] *Id.*
[35] Leatherman Dec. at 39 **Exhibit A**, Sandel Website Idea Submission Page at the time of Plaintiff's submission.

6

This constitutes an unenforceable agreement to agree similar to that discussed in *Kleck* and *Fort Worth*. "It is well settled law that when an agreement leaves matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree."[36] Essentially, the Plaintiff handed over her idea without first bargaining for compensation. As noted in *Kleck*, "the idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power."[37]

Plaintiff's sole alleged breach of contract is "Defendant's failure to contract with the Plaintiff prior to taking the product to market."[38] However, "an agreement to make a future contract is enforceable only if it is specific as to all essential terms, and no terms of the proposed agreement may be left to future negotiations."[39] And, "the law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue."[40]

The conclusion reached in *Kleck* was followed by the Southern District of Texas in *Keane v. Fox Television Stations, Inc.*[41] *Keane* reiterated the holding of *Kleck* stating that

> [f]or the submission of an idea to give rise to an implied contract, two circumstances must have existed when the idea was disclosed: (1) the 'idea purveyor' must have 'clearly conditioned his offer to convey the idea upon an obligation to pay' for the use of that idea *before* it was disclosed, and (2) the offeree must have agreed to have the idea disclosed knowing of this condition.[42]

---

[36] *Kleck*, 145 F. Supp. 2d at 826 (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3D 831, 846 (Tex. 2000))(footnotes omitted).
[37] *Id.* at 824-25 (quoting *Desny v Wilder*, 299 P. 2d 257, 270 (Cal. 1956).
[38] Plaintiff's Second Amended Petition at 6.4, Dkt. 9.
[39] *Kleck*, 145 F. Supp. 2d at 826 (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000).
[40] *Id.* at 824-25 (quoting *Desny*, 299 P.2d at 270).
[41] 297 F. Supp. 2d 921 (S.D. Tex. 2004).
[42] *Id.* at 941 (quoting *Kleck*, 145 F. Supp. 2d at 824).

The Southern District's holding in *Keane* was affirmed by the Fifth Circuit in *Keane v. Fox Television Stations, Inc.*[43] In affirming the decision, the Fifth Circuit cited *Kleck* with approval.[44]

According to the above authorities, it is clear that Plaintiff does not state a cause of action for breach of contract under Texas law. As such, her claim should fail.

    b. Fraud

The elements of a fraud claim under Texas law include: "(1) a material misrepresentation of a **present existing fact**, (2) that was false, (3) that was either known to be false when made or was asserted without knowledge of the truth, (4) that was intended to be acted upon, (5) that was relied upon, and (6) that caused injury."[45] Plaintiff does not allege any evidence which supports her position that Defendant misrepresented any present existing fact at the time of Plaintiff's submission on February 17, 2006. Instead, Plaintiff argues that Sandel committed fraud because it never intended to enter into a separate agreement with Plaintiff. The sole apparent basis for the fraud claim is that Sandel never entered into a separate agreement to pay her the millions she is claiming.[46] However, "[t]he mere failure to perform a promise does not constitute evidence of the promissor's intent not to perform at the time the promise was made."[47]

Plaintiff only supports her allegation as to Defendant's mental state and intentions with actions which occurred *after* the alleged agreement was entered. Using Plaintiff's reasoning, every Plaintiff asserting a cause of action for breach of contract long after the contract was

---

[43] 129 Fed. Appx. 874 (5th Cir. 2005).
[44] *Id.* at 876.
[45] *Kleck v. Bausch & Lomb*, 145 F. Supp. 2d 819, 828 (W.D. Tex. 2000); *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 718 (5th Cir. 1995); *DeSantis v. Wackenhut Corp.*, 793 S.W. 2d. 670, 688 (Tex. 1990), cert. denied. Emphasis added.
[46] Sandel's legal argument regarding Plaintiff's fraud claim is very factually similar to several cases where there was an actual enforceable agreement in place. The fact that Sandel argues that the language on its website does not constitute an enforceable contract is of no moment. Indeed, in the *Kleck* case the Court handled a similar situation where the allegation of fraud was based on the breach of an unenforceable contract. *Kleck*, F. Supp. 2d at 828. Relying on several of the same breach of contract cases cited in this brief, the *Kleck* court came to the same conclusion that Defendant urges this Court to reach. *Id.*
[47] *Kleck*, F. Supp. 2d at 828.

entered into could also allege a cause of action for fraud by asserting the alleged breach of contract as evidence that the defendant never intended to uphold the promise at the time the contract was entered. Texas law will not allow such an argument. "Failure to perform, standing alone, is no evidence of a promissor's intent not to perform when the promise was made."[48] Thus, even if Sandel had never offered Plaintiff any type of compensation for her submission, this fact alone would not be enough to support Plaintiff's fraud claim.

Moreover, Plaintiff's claim must fail because Sandel offered Plaintiff its standard idea submission agreement long before she brought this suit.[49] The fact that Defendant *did* offer to enter into an agreement with Plaintiff is strong evidence that Defendant intended to honor the promise it made to Plaintiff at the time she submitted her idea.[50] Plaintiff's real complaint is that Defendant did not offer her and her attorney the millions that she wanted.

Plaintiff must allege some specific basis for her allegation that Defendant's representation was false at the time it was made. However, Plaintiff's deposition responses indicate that she has no evidence that Defendant's statements were false at the time they were made.[51] There is no basis for any inference that Defendant did not intend to comply with any agreement it had, assuming Defendant ever had any enforceable agreement with Plaintiff. Under applicable law, Plaintiff had no enforceable agreement with Defendant. How could Defendant have never intended to perform under an agreement it never had with Plaintiff? Defendant states in no uncertain terms on its web site that the parties have "no further obligations to each other,

---

[48] *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). *Accord Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 48-49 (Tex. 1998)("the mere failure to perform a contract is not evidence of fraud"), *Crim Truck & Tractor Co. v. Navistar Int'l Trans. Co.*, 823 S.W.2d 591, 597 ("the failure to perform the terms of a contract is a breach of contract, not a tort").
[49] Cole Dep. 60:14-17 and Deposition Exhibit 8.
[50] *See Spoljaric*, 708 S.W.2d at 435 ("No pretense of performance by the defendant has also been held to be a factor showing lack of intent.")
[51] Cole Dep. 90:4-92:19

9

unless a separate agreement is entered in to" so Defendant did not misrepresent its intentions at the time of the submission by Plaintiff.

Moreover, Defendant has a long history of entering into agreements with individuals after they submit ideas to Defendant, including over twelve agreements to pay idea submitters since 2002. This long history does not support any inference for Plaintiff's fraud claim that Defendant never intended to enter into any agreement with her in 2006. Accordingly, Plaintiff's cause of action for fraud must fail.

### III.   CONCLUSION

Plaintiff's causes of action cannot withstand summary judgment. Even taking all facts in the light most favorable to Plaintiff, no more than an agreement to agree has been alleged in this case and such an agreement is unenforceable under Texas law. Additionally, Plaintiff has not demonstrated any facts which would indicate that the statements made on Defendant's website were false at the time they were made to support a claim of fraud.

Dated April 6, 2010                                                           Respectfully submitted,

*/s/ Charles W. Hanor*

Charles W. Hanor
Hanor, Lively & Cernyar, PLLC
State Bar No. 08928800
750 Rittiman Road
San Antonio, Texas 78209
Ph: (210) 829-2002
Fax: (210) 829-2001
chanor@hanor.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I, the undersigned counsel for the Defendant, to hereby certify that I have this 6th day of April, 2010 a true and correct copy of the foregoing pleading was filed using the Court's CM/ECF system which will send notification to the following:

Carl Dawson
Ryan & Dawson
770 S. Post Oak Ln. Ste. 550
Houston, TX 77056

_____
Charles W. Hanor