UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| CANDICE COLE<br>　　*Plaintiff,*<br><br>v.<br><br>SANDEL MEDICAL<br>INDUSTRIES, L.L.C.<br>　　*Defendant.* | §<br>§<br>§<br>§<br>§   Civil Action No. SA-09-CA-0597-H<br>§<br>§<br>§<br>§ |

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY

Having considered *Defendant's Motion for Summary Judgment* (Dkt. 46) and any responses and replies thereto, the Court finds the Motion to be well taken and GRANTS Defendant's summary judgment hereby disposing of all claims in Defendant's favor.

### I.   FACTUAL BACKGROUND

Sandel is a medical supply company focusing in the area of patient and hospital employee safety. To identify safety issues which need to be addressed, Sandel collaborates with healthcare professionals by accepting online idea submissions as an element of its research and design process. To this end, Sandel's website includes a page where nurses and other hospital personnel are encouraged to submit ideas. At the bottom of the website submission form, submitters are informed that Sandel and the submitter "shall have no further obligations to each other, unless a separate agreement is entered in to."

Sandel has received thousands of submissions through its website and through paper submissions. Sandel holds quarterly review meetings where it reviews the submissions received to determine whether or not the submissions are within the scope of Sandel's product line, whether Sandel has already received a submission for a similar product and whether the product

1

idea is feasible. Based on this meeting, Sandel sends out letters to all submitters. When Sandel decides to proceed with an idea it contacts the idea-submitter and informs them that their idea has been selected. At that point, Sandel sends the submitter its standard idea submission agreement. The agreement for non-patentable ideas provides for a payment of $250 upon execution, $500 when the first order for the product is placed and up to $4,000 per year for five years.

Sandel has a product line of 28 products which it actively markets. Of these 28 products, 12 originated as submissions to Sandel from health care providers who were paid for their submissions. Very few of the idea submissions are novel or unique. Very few of the idea submissions are protectable by a patent, trademark or copyright. Very few of the idea submissions are commercially practicable or marketable. It is not surprising or unexpected that very few of the idea submissions ever see the light of day. Plaintiff's idea submission was not novel, unique, patentable, copyrightable, commercially practical or marketable.

In 2004, Sandel introduced a line of products called the "TIME OUT® Products." The products were inspired by the 2004 Joint Commission[1] rule UP.1.03.01 which requires all hospitals accredited by the Joint Commission to perform a "time-out" immediately prior to starting an operation. The purpose of the time-out is to verify that the correct procedure is being performed on the correct patient in the correct place. Because under the United States Code a hospital which is accredited by the Joint Commission meets the Medicare conditions of participation (a requirement for Medicare reimbursement), virtually all hospitals comply with the Joint Commission rules.[2] In fact, according to the Joint Commission website, "more than 17,000 health care organizations and programs in the United States" are accredited and certified by the

---

[1] Formerly the Joint Commission on Accreditation of Healthcare Organizations or JCAHO.
[2] *See* 42 U.S.C. §§ 1395bb(a), (b).

Joint Commission. Thus, Sandel has a wide market for its TIME OUT® Products which are designed to help health care institutions remember and comply with the time-out procedure.

Beginning in 2004, Sandel began promoting its TIME OUT® Products to hospitals. All TIME OUT® Products are orange in color and have the words "TIME OUT" written on them in bold letters. The line of TIME OUT products is pictured below. The markers, sleeve and hood were marketed and Plaintiff was aware of them when she submitted her idea for an orange 8 1/2 X 11 piece of paper with adhesive on one side containing the words TIME OUT.



On April 19, 2005 Sandel obtained US Trademark Registration Number 2,966,022 for TIME OUT in the area of "[r]eusable and disposable tools, appliances and accessories used in an operating room during surgical procedures, namely, skin markers for surgical use and paper-based sleeves for use with surgical scalpels," with a date of first use on February 26, 2004.

Plaintiff is a nurse at the Methodist Healthcare System of San Antonio ("Methodist Hospital). Methodist Hospital operates many health care facilities in San Antonio, Texas. On February 17, 2006, Plaintiff submitted an idea for an "8 1/2 x 11 ORANGE SHEET of paper that has in LARGE BOLD PRINT 'TIME OUT'. [sic]." The complete idea submission statement read:

> I propose an 8 1/2 x 11 ORANGE SHEET of paper that has in LARGE BOLD PRINT "TIME OUT". This sheet would have an adhesive on the back and it could be adhered to whatever draping the Surgeon will be using. After the Surgeon is gowned and gloved the Tech always hands the drape to the surgeon, this ORANGE sheet will be adhered to the drape and draw attention the matter of performing the TIME OUT not only to the Tech but to the SURGEON as well. The TIME OUT can then be performed prior to draping and the beginning of the procedure as per JACHO standard and ensure 100% compliance.

Prior to making her submission, Cole was aware of Sandel's TIME OUT product line including Sandel's orange "Time Out" marking pen, which she mentioned in her submission. Indeed, Defendant's orange TIME OUT® Products had been on the market for two years prior to Plaintiff's submission. As such, Plaintiff's suggestion to use the color orange and the words "TIME OUT" were not new, they were based on here awareness of Defendant's other orange TIME OUT products. The only parts of Plaintiff's submission that were not already in use in Sandel's other TIME OUT® Products was her suggestion that the words TIMEOUT be printed on an orange 8 ½ X 11 sheet of paper with an adhesive backing which could be adhered to the draping used by a surgeon. None of these suggestions were incorporated in Defendant's time-out beacon. A piece of paper with the word "TIME OUT" printed on it is not patentable[3] or copyrightable.[4] Defendant already owned the U.S. trademark registration for TIME OUT at the time of Plaintiff's submission.

Plaintiff submitted her idea through Defendant's website submission form. The form has no mention of financial compensation. At the time of Cole's submission, the form stated:

> I do not give any rights in my submission to Sandel Medical Industries L.L.C. (SMI). Any rights in my submission may be given to SMI only in a future agreement between SMI and myself.

---

[3] See *In Re Gulak*, 703 F.2d 1381, 1385 (Fed. Cir. 1983) ("the critical question is whether there exists any new and unobvious functional relationship between the printed matter and the substrate."); accord *In re Ngai*, 367 F.3d 1336 (Fed. Cir. 2004).
[4] http://www.copyright.gov/help/faq/faq-protect.html. The claim that Plaintiff would have copyrighted her idea is unfounded. It is simply not copyrightable subject matter.

4

> I agree not to reveal my submission (verbally or in writing) to anyone other than SMI, for one year from the date of this agreement.
>
> SMI agrees not to use, sell, or disclose to others, any of the submitter's information provided above. SMI accepts this submission only for evaluation. SMI and submitter shall have no further obligations to each other, unless a separate agreement is entered in to.

Before submitting an idea to the Defendant, Plaintiff had to click "I agree" to the language above and click the "submit" button.

After reviewing Plaintiff's submission, Lucy B. Reday, the Chairperson of the Issue Review Board at Defendant wrote to Plaintiff and informed her on April 14, 2006 that Defendant's review board decided not to pursue Plaintiff's submission. The letter informed Plaintiff that she was "released of any obligations with [Defendant] and [Plaintiff] may pursue [her] issue at liberty with another organization." Plaintiff's submission was not practical because it is very difficult to sterilize paper. Moreover, if something adhesive is stuck to the drape in a sterile environment, it would not be able to be removed without risking a tear in the drape that would compromise sterility. Thus, Plaintiff's idea was not feasible on multiple levels.

Plaintiff's online submission, the automatic computer generated Sandel acknowledgement of receipt of the submission and the letter from Reday were the only communications between Plaintiff and Defendant in 2006. There were no other communications or representations and in particular no oral communications or representations between the parties prior to or at the time of Plaintiff's submission.

In 2007, Defendant began development of its Time Out Beacon following a suggestion by a nurse, Lynn Miles of an orange towel with the words TIME OUT on it. Ms. Miles is currently being compensated for her idea of an orange towel with the words TIME OUT on it pursuant to Sandel's standard idea submission agreement. The Time Out Beacon is similar to a

5

standard 16 X 24 inch surgical towel, only dyed orange and with the words "TIME OUT" prominently placed thereon. A standard surgical towel is about twice the size of the piece of paper proposed by Plaintiff. Sandel's Time Out Beacon does not have any adhesive backing. Indeed, the only thing that Plaintiff's submission and Defendant's TIME OUT Beacon have in common is that they are orange and have the words TIME OUT written on them. However, the color orange and the words "TIME OUT" were part of Defendant's line of TIME OUT® Products well before Defendant made her submission. Due to the significant differences between Plaintiff's submission and Defendant's commercially marketed Time Out Beacon orange towel, no connection was drawn between the two.

However, when Defendant launched its forthcoming Time Out Beacon orange surgical towel in 2007, it received a complaint from Plaintiff indicating that she believed she was the first submitter of the idea for the Time Out Beacon and she demanded compensation. At that time, Defendant reviewed Plaintiff's submission and Defendant's Time Out Beacon and concluded that they are not the same idea. Regardless, to assuage Plaintiff's demands, the decision was made to offer Plaintiff its standard idea agreement. Defendant decided to offer Plaintiff this agreement in an effort to maintain good will with idea submitters in general. At no time did Defendant base its product on Plaintiff's idea and Plaintiff's submission is not the same as Defendant's product.

## II.  STANDARDS FOR SUMMARY JUDGMENT

The purpose of a motion for summary judgment is to determine whether there exist genuine issues of material fact to be tried.[5] Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[5] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

6

a judgment as a matter of law."[6] A factual issue is material if its resolution could affect the outcome of the action and disputes about such factual issues are genuine if the evidence would allow a reasonable jury to find for the non-moving party.[7]

### III. ARGUMENTS AND AUTHORITIES

This case is in Federal Court based on diversity of citizenship. The underlying claims are based on Texas State law. Thus, according to the Erie Doctrine, Texas State law governs the rights and obligations of the parties.[8]

   a. *Breach of Contract*

The facts and issues in this case are strikingly similar to those in *Kleck v. Bausch & Lomb, Inc.*[9] where the court held that where an idea is completely disclosed without a corresponding promise at the time of submission to pay for that idea, no binding agreement is created due to failure of consideration.[10] In *Kleck*, the plaintiff submitted an idea to Bausch & Lomb for a vampire themed marketing strategy relating to sunglasses.[11] Before submitting his idea, Kleck had Bausch & Lomb sign an agreement promising "not to use or disclose Kleck's marketing ideas 'until or unless a later written agreement between [Kleck] and [B&L] in [sic] entered into.'"[12] The court noted that this was "at best an 'agreement to agree,' which Texas law will not enforce."[13]

The *Kleck* decision was based on the holding in Texas Supreme Court case of *Fort Worth Independent School District. v. Fort Worth*.[14] In *Fort Worth*, the alleged contract provided: "If

---

[6] FED. R. CIV. P. 56(c).
[7] *GeoSouthern Energy Corp. v. Chesapeake Operating, Inc.,* 274 F.3d 1017, 1020 (5th Cir. 2001).
[8] *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).
[9] 145 F. Supp. 2d 819, 824-26 (W.D. Tex. 2000).
[10] *Id.*
[11] *Id.* at 823.
[12] *Id.* at 826.
[13] *Id.*
[14] 22 S.W.3D 831 (Tex. 2000).

the City should negotiate a new agreement with [Bell], we commit the City to arriving at an appropriate arrangement with the FWISD to share in that revue."[15] In reviewing this agreement, the court found that this was simply an "agreement to make a future contract."[16] The court held that this agreement was unenforceable because it was merely an "agreement to agree" and was not specific as to all terms.[17]

Likewise, Plaintiff in this case submitted her idea to Defendant through its website which provided that the parties would "have no further obligations to each other, unless a separate agreement is entered in to."[18] This constitutes an unenforceable agreement to agree similar to that discussed in *Kleck* and *Fort Worth*. "It is well settled law that when an agreement leaves matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree."[19] Essentially, the Plaintiff handed over her idea without first bargaining for compensation. As noted in *Kleck*, "the idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power."[20]

Plaintiff's sole alleged breach of contract is "Defendant's failure to contract with the Plaintiff prior to taking the product to market."[21] However, "an agreement to make a future contract is enforceable only if it is specific as to all essential terms, and no terms of the proposed agreement may be left to future negotiations."[22] And, "the law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used

---

[15] *Id.* at 846.
[16] *Id.*
[17] *Id.*
[18] Exhibit A.
[19] *Kleck*, 145 F. Supp. 2d at 826 (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3D 831, 846 (Tex. 2000))(footnotes omitted).
[20] *Id.* at 824-25 (quoting *Desny v Wilder*, 299 P. 2d 257, 270 (Cal. 1956).
[21] Plaintiff's Second Amended Petition at 6.4, Dkt. 9.
[22] *Kleck*, 145 F. Supp. 2d at 826 (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000).

for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue."[23]

The conclusion reached in *Kleck* was followed by the Southern District of Texas in *Keane v. Fox Television Stations, Inc.*[24] *Keane* reiterated the holding of *Kleck* stating that

> [f]or the submission of an idea to give rise to an implied contract, two circumstances must have existed when the idea was disclosed: (1) the 'idea purveyor' must have 'clearly conditioned his offer to convey the idea upon an obligation to pay' for the use of that idea *before* it was disclosed, and (2) the offeree must have agreed to have the idea disclosed knowing of this condition.[25]

The Southern District's holding in *Keane* was affirmed by the Fifth Circuit in *Keane v. Fox Television Stations, Inc.*[26] In affirming the decision, the Fifth Circuit cited *Kleck* with approval.[27]

According to the above authorities, it is clear that Plaintiff does not state a cause of action for breach of contract under Texas law. Accordingly, her claim should fail.

  *b. Fraud*

To state a claim for fraud under Texas law, a plaintiff must allege "(1) a material misrepresentation of a **present existing fact**, (2) that was false, (3) that was either known to be false when made or was asserted without knowledge of the truth, (4) that was intended to be acted upon, (5) that was relied upon, and (6) that caused injury."[28] Plaintiff does not allege any evidence which supports her position that Defendant misrepresented any present existing fact at the time of Plaintiff's submission on February 17, 2006. Instead, Plaintiff argues that Sandel committed fraud because it never intended to enter into a separate agreement with Plaintiff. The

---

[23] *Id.* at 824-25 (quoting *Desny*, 299 P.2d at 270).
[24] 297 F. Supp. 2d 921 (S.D. Tex. 2004).
[25] *Id.* at 941 (quoting *Kleck*, 145 F. Supp. 2d at 824).
[26] 129 Fed. Appx. 874 (5th Cir. 2005).
[27] *Id.* at 876.
[28] *Kleck v. Bausch & Lomb*, 145 F. Supp. 2d 819, 828 (W.D. Tex. 2000); *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 718 (5th Cir. 1995); *DeSantis v. Wackenhut Corp.*, 793 S.W. 2d. 670, 688 (Tex. 1990), cert. denied. Emphasis added.

sole apparent basis for the fraud claim is that Sandel never entered into a separate agreement to pay her the millions she is claiming.[29] However, "[t]he mere failure to perform a promise does not constitute evidence of the promissor's intent not to perform at the time the promise was made."[30]

Plaintiff only supports her allegation as to Defendant's mental state and intentions with actions which occurred *after* the alleged agreement was entered into. Using Plaintiff's reasoning, every Plaintiff asserting a cause of action for breach of contract long after the contract was entered into could also allege a cause of action for fraud by asserting the alleged breach of contract as evidence that the defendant never intended to uphold the promise at the time the contract was entered. Texas law will not allow such an argument. "Failure to perform, standing alone, is no evidence of a promissor's intent not to perform when the promise was made."[31] Thus, even if Sandel had never offered Plaintiff any type of compensation for her submission, this fact alone would not be enough to support Plaintiff's fraud claim.

Moreover, Plaintiff's claim must fail because Sandel offered Plaintiff its standard idea submission agreement long before she brought this suit. The fact that Defendant *did* offer to enter into an agreement with Plaintiff is strong evidence that Defendant intended to honor the

---

[29] Sandel's legal argument regarding Plaintiff's fraud claim is very factually similar to several cases where there was an actual enforceable agreement in place. The fact that Sandel argues that the language on its website does not constitute an enforceable contract is of no moment. Indeed, in the *Kleck* case the Court handled a similar situation where the allegation of fraud was based on the breach of an unenforceable contract. *Kleck*, F. Supp. 2d at 828. Relying on several of the same breach of contract cases cited in this brief, the *Kleck* court came to the same conclusion that this Court reaches. *Id.*
[30] *Kleck*, F. Supp. 2d at 828.
[31] *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). *Accord Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 48-49 (Tex. 1998)("the mere failure to perform a contract is not evidence of fraud"), *Crim Truck & Tractor Co. v. Navistar Int'l Trans. Co.*, 823 S.W.2d 591, 597 ("the failure to perform the terms of a contract is a breach of contract, not a tort").

sole apparent basis for the fraud claim is that Sandel never entered into a separate agreement to pay her the millions she is claiming.[29] However, "[t]he mere failure to perform a promise does not constitute evidence of the promissor's intent not to perform at the time the promise was made."[30]

Plaintiff only supports her allegation as to Defendant's mental state and intentions with actions which occurred *after* the alleged agreement was entered into. Using Plaintiff's reasoning, every Plaintiff asserting a cause of action for breach of contract long after the contract was entered into could also allege a cause of action for fraud by asserting the alleged breach of contract as evidence that the defendant never intended to uphold the promise at the time the contract was entered. Texas law will not allow such an argument. "Failure to perform, standing alone, is no evidence of a promissor's intent not to perform when the promise was made."[31] Thus, even if Sandel had never offered Plaintiff any type of compensation for her submission, this fact alone would not be enough to support Plaintiff's fraud claim.

Moreover, Plaintiff's claim must fail because Sandel offered Plaintiff its standard idea submission agreement long before she brought this suit. The fact that Defendant *did* offer to enter into an agreement with Plaintiff is strong evidence that Defendant intended to honor the

---

[29] Sandel's legal argument regarding Plaintiff's fraud claim is very factually similar to several cases where there was an actual enforceable agreement in place. The fact that Sandel argues that the language on its website does not constitute an enforceable contract is of no moment. Indeed, in the *Kleck* case the Court handled a similar situation where the allegation of fraud was based on the breach of an unenforceable contract. *Kleck*, F. Supp. 2d at 828. Relying on several of the same breach of contract cases cited in this brief, the *Kleck* court came to the same conclusion that this Court reaches. *Id.*
[30] *Kleck*, F. Supp. 2d at 828.
[31] *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). *Accord Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 48-49 (Tex. 1998)("the mere failure to perform a contract is not evidence of fraud"), *Crim Truck & Tractor Co. v. Navistar Int'l Trans. Co.*, 823 S.W.2d 591, 597 ("the failure to perform the terms of a contract is a breach of contract, not a tort").

promise it made to Plaintiff at the time she submitted her idea.[32] Plaintiff's real complaint is that Defendant did not offer her and her attorney the millions that she wanted.

Plaintiff must allege some specific basis for her allegation that Defendant's representation was false at the time it was made.  However, at the deposition of Plaintiff, Candice Cole, the following exchange occurred:

> Q Why [did you believe Sandel was] being less than honest with you in 2006?
>
> A You had said: At this time, do I believe they were? And I believe they were because they sent me a letter saying they weren't going to go with my idea because they already had one and sent the sample in my packet of their TIME OUT blade, and they -- they weren't going to move forward with it and then a year later, they moved forward with an -- almost the same idea, except it was made out of a different type of material. And had I not been at that dinner, I would have never known until after the product had already gone out and then it would have been a different issue.
>
> Q Do you know whether or not someone else suggested a TIME OUT towel to Sandel?
>
> A I do not know. I just know based on Brian Mach's review of all the submissions.
>
> Q Let's refer over to Page 5 of your complaint.
>
> A Do you want to put that back in your stack?
>
> Q Yes, ma'am, I do. One other question: Regarding Exhibit 1, if I understand it correctly, this is the only communication you had with Sandel in 2006. Right?
>
> A Yes.
>
> Q No discussions with anybody over the phone or in person?
>
> A No, sir.
>
> Q And no other communications other than you received a confirmation that you had submitted, Exhibit 1?
>
> A Correct.

---

[32] *See Spoljaric*, 708 S.W.2d at 435 ("No pretense of performance by the defendant has also been held to be a factor showing lack of intent.")

It is clear from Plaintiff's responses that she has no evidence that Defendant's statements were false at the time they were made. There is no basis for any inference that Defendant did not intend to comply with any agreement it had, assuming Defendant ever had any enforceable agreement with Plaintiff. Under applicable law, Plaintiff had no enforceable agreement with Defendant. How could Defendant have never intended to perform under an agreement it never had with Plaintiff? Defendant states in no uncertain terms on its web site that the parties have "no further obligations to each other, unless a separate agreement is entered in to" so Defendant did not misrepresent its intentions at the time of the submission by Plaintiff.

Moreover, Defendant has a long history of entering into agreements with individuals after they submit ideas to Defendant. Indeed, Defendant has entered into over twelve agreements to pay idea submitters since its 2002 inception. This long history of payment to idea submitters does not support any inference for Plaintiff's claim that Defendant never intended to enter into any agreement with her if they decided to use her idea. Accordingly, Plaintiff's cause of action for fraud must fail.

### III.   CONCLUSION

For the above stated reasons, Defendant's Motion for Summary Judgment is hereby GRANTED. The parties are encouraged to submit further briefing regarding the appropriateness of attorney fees.

GRANTED this _____ day of _____, 2010.

_____
HARRY LEE HUDSPETH
SENIOR UNITED STATES DISTRICT JUDGE